IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AUBREY PERRY

    *Plaintiff,*

    v.

                                        Civil Action No. ELH-16-3207

DILLON'S BUS SERVICE, INC., *et al.*

    *Defendants.*

## MEMORANDUM OPINION

Aubrey Perry, a commercial bus driver, filed suit against his former employers, Dillon's Bus Service, Inc. ("Dillon's") and Coach USA, Inc. ("Coach") (collectively "Dillon's"),[1] alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2014 Repl. Vol.), § 20-602 of the State Government Article ("S.G."). ECF 1. Perry also asserts claims under Maryland law for wrongful discharge and intentional infliction of emotional distress. *Id.*[2]

In November 2014, plaintiff was taken to an emergency room by ambulance after experiencing chest pains and numbness in his arm while working as a bus driver. Mr. Perry claims that although he was medically cleared the next day to return to work, his former

---

[1] Plaintiff contends that Coach acted as plaintiff's joint employer based on its association with and control of Dillon's. ECF 1, ¶ 12.

[2] Although the Complaint also refers to the "FMLA" (ECF 1, ¶ 61), the Family Medical Leave Act, 29 U.S.C. §§ 2601-2654, plaintiff subsequently clarified that this reference was a typographical error. ECF 18 at 9.

employers did not permit him to do so for a one-month period.  At the time, plaintiff was 59 years of age.  ECF 1, ¶ 37.

Defendants filed a motion to dismiss (ECF 14), pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion"), supported by an exhibit.  ECF 14-2.  Plaintiff opposes the Motion (ECF 18, "Opposition"), supported by exhibits.  ECF 16-1 to ECF 16-4.[3]  Defendants replied (ECF 22, "Reply"), and submitted another exhibit. ECF 22-1.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I.    Factual and Procedural Background[4]

Defendants operate a commercial bus service.  ECF 1, ¶ 8.  They hired plaintiff as a bus driver on or about March 24, 2014.  *Id.*, ¶ 11.  According to plaintiff, he "was a loyal employee who made significant contributions to Defendants' business and performed all of his essential job functions properly and satisfactorily."  *Id.*, ¶ 16.  As noted, plaintiff was 59 years of age at the relevant time.  *Id.*, ¶ 37.

On November 6, 2014, plaintiff experienced chest pains and numbness in his arm while driving on his bus route in Anne Arundel County. *Id.*, ¶ 17.  He was taken by ambulance to the emergency room at the Anne Arundel Medical Center.  *Id.*  Plaintiff was released from the hospital with a note that authorized him to return to work the next day.  On November 7, 2014, he produced the doctor's note and informed his employers of his desire to return to work.  *Id.*, ¶¶ 18-19.

---

[3] Plaintiff's original response was docketed at ECF 16; he docketed the corrected version three days later.  ECF 18.  The Opposition incorporates the exhibits appended to ECF 16.

[4] The factual allegations are derived from the Complaint.  Based on the procedural posture of the case, I must assume the truth of any well-pleaded factual allegations.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

However, Dillon's Safety Manager, Kimberly Nutter, informed plaintiff that he would need to provide the results of his emergency room visit before he would be allowed to return to work. ECF 1, ¶ 20. According to Mr. Perry, Ms. Nutter, or someone authorized by her or defendants, contacted the hospital and attempted to obtain plaintiff's medical information. *Id.* The hospital refused to release the records and informed defendants that "the request was a violation of Plaintiff's rights under the Health Insurance Portability and Accountability Act (HIPAA)...." *Id.*, ¶ 21.

Plaintiff attended an appointment with his primary care physician, Dr. William Sykora, on November 13, 2014, and received another return-to-work document, along with the results of his emergency room visit, which he submitted to Ms. Nutter the next day. *Id.*, ¶¶ 24-25. Nevertheless, Ms. Nutter continued to "bar" plaintiff from returning to work, "claiming that she 'may need' even more medical information." *Id.*, ¶ 25.

On November 17, 2014, Ms. Nutter informed plaintiff that Dr. Liva,[5] Coach's Medical Director, wanted plaintiff to undergo a cardiac catheterization prior to returning to work. *Id.*, ¶ 26. Mr. Perry maintains that he "was expected to cover the cost of this procedure[.]" *Id.*, ¶ 27. He informed Ms. Nutter on November 20, 2014, that his primary care physician would not order a cardiac catheterization because the test was an "'overreach'" and medically unnecessary. *Id.*, ¶ 28. During ensuing communications about his job status, when Mr. Perry asked if he would be terminated because his physician would not order the catheterization, Ms. Nutter merely promised to call plaintiff back the next day, but she failed to do so. *Id.*, ¶ 29.

"At that point, wrongfully barred from working by Defendants, unsure he even had a job, and having gone without compensation for three weeks, Plaintiff sought help from the Maryland

---

[5] Plaintiff did not provide the first name of Dr. Liva.

Department of Labor, Licensing and Regulation Division of Unemployment Insurance ('DLLR'), including guidance as to possible eligibility for benefits." ECF 1, ¶ 30.

Then, on November 26, 2016, Ms. Nutter instructed Mr. Perry to call another company representative, Ingrid Murley, and provide that person with a "summary of information related to his emergency room visit and subsequent events." *Id.*, ¶ 32. Plaintiff called Ms. Murley, who responded that she would attempt to contact plaintiff's primary care physician. *Id.*, ¶ 33.

A week later, on December 3, 2014, DLLR informed Mr. Perry that "Defendants had falsely reported to the State that Plaintiff had been placed on leave of absence for failing a Department of Transportation ("DOT") physical." *Id.*, ¶ 34. Plaintiff insists that he was never required to take a DOT physical, never failed any test, and "had never received notice of any such alleged failure or of any such 'leave' status." *Id.*

On December 5, 2014, "after days of no communication between Plaintiff and Defendants," Ms. Nutter told plaintiff that he was medically cleared for work by the medical director, Dr. Liva. *Id.*, ¶ 35. However, "[b]y then, Plaintiff had gone a month without pay and was already in the process of taking other employment." *Id.*

Plaintiff contends that the defendants engaged in conduct outlined above without any justification, in an effort to eliminate him from employment, "solely" because of his age. *Id.* ¶ 39; *see also id.* ¶¶ 28-40. According to plaintiff, defendants "fabricated medical requirements" and "forced him" and others out of a job. *Id.* ¶ 40; *see id.* ¶ 39.

The Complaint contains the following causes of action: "Count I: Violation of ADEA"; "Count II: Violation of ADA"; "Count III: Violation of ADA-Retaliation"; "Count IV: Violation of FLSA"; "Count V: Wrongful Discharge"; "Count VI: Violation of Maryland Law"; and

"Count VIII: Intentional Infliction of Emotional Distress."[6] Mr. Perry seeks back pay, "front pay," benefits, and other compensatory damages in the amount of $100,000.00, as well as liquidated damages and/or punitive damages in the amount of $100,000.00, along with attorney's fees. ECF 1 at 7-13.

Defendants urge dismissal of Mr. Perry's claims, asserting that "after the medical incident Plaintiff was ineligible to drive a bus until medically cleared pursuant to federal law." ECF 14 at 2. Further, they claim that Perry "was not discharged in contravention of a clear mandate of public policy." *Id.* And, they contend that plaintiff "has not suffered any 'severe emotional distress' as a result of any extreme or outrageous conduct by Dillon's." *Id.*[7]

## II.    Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Goines v. Valley Cmty, Servs, Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, __U.S. __, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule

---

[6] The Complaint does not contain a Count VII.

[7] In their Reply (ECF 22), defendants withdrew their argument challenging the timeliness of plaintiff's filing with the Equal Employment Opportunity Commission. *Id.* at 1.

is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' ...." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, __U.S.__, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d

564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, __U.S. __, 132 S. Ct. 1960 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The purpose of the rule is to ensure that defendants are "given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555–56 (2007). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

Under limited exceptions, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Here, the exhibits appended to the Motion, the Opposition, and the Reply all relate to when Mr. Perry filed his charge of discrimination with the EEOC. Because defendants withdrew their arguments as to the timeliness of plaintiff's EEOC filing, I need not consider the exhibits.

### III. Discussion

### A.

In Counts I through VI of the Complaint, Mr. Perry claims that defendants violated the ADEA, the ADA, the FLSA, and the FEPA, as well as Maryland common law prohibiting wrongful discharge, by not permitting him to return to work despite his doctor's note authorizing him to do so.[8] Defendants argue that Counts I through VI must be dismissed because federal law required that plaintiff be "medically certified prior to returning to work as a motor coach operator." ECF 14 at 5.

As a driver of a commercial motor vehicle ("CMV") for a motor carrier, Mr. Perry and his employers are bound by regulations issued by DOT's Federal Motor Carrier Safety Administration ("FMCSA"). *See* 49 C.F.R. § 391.1(a).

---

[8] In his Opposition, plaintiff states that the Complaint also raises claims of defamation and conspiracy. ECF 18 at 1. But, the Complaint did not contain any reference to these causes of action. And, "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Mylan Laboratories, Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Accordingly, I will not consider claims of defamation or conspiracy.

In *N.L.R.B. v. Pessoa Const. Co.*, 632 F. App'x 760, 763 (4th Cir. 2015) (per curiam), the Fourth Circuit summarized the extensive medical certification regulations promulgated by FMCSA. It said, *id.* (emphasis added):

> Pursuant to the safety regulations of the Federal Motor Carrier Safety Administration ("FMCSA") of the United States Department of Transportation ("DOT"), a CMV driver is required, among other things, to undergo a medical examination and obtain a medical examiner's certificate that he or she is physically qualified to safely operate a CMV. *See* 49 C.F.R. §§ 391.11(b)(4), 391.41, 391.43, & 391.45. The driver must be medically certified every 24 months. *See* 49 C.F.R. § 391.45(b)(1). However, *if the driver's "ability to perform [his or her] normal duties has been impaired by a physical or mental injury or disease," medical certification is again required.* 49 C.F.R. § 391.45(c). *A driver is not qualified to drive if he has a "current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure."* 49 C.F.R. § 391.41(b)(4).

In addition, 49 C.F.R. § 391.43(a) provides that "the medical examination must be performed by a medical examiner listed on the National Registry of Certified Medical Examiners under subpart D of part 390 of this chapter." *See also* 49 C.F.R. § 390.5 (requiring that medical examinations conducted on and after May 21, 2014, be performed by "an individual certified by FMCSA and listed on the National Registry of Certified Medical Examiners….").

Defendants posit, ECF 22 at 2: "It is an indisputable fact that Plaintiff suffered a medical emergency while operating a motor coach full of passengers, stopped the vehicle on account of the acute exigency, and was carried off on a stretcher to a waiting ambulance." In their view, they sought to comply with the FMCSA regulations related to medical certification, and their decision to abide by these regulations did not violate Mr. Perry's rights. Further, defendants emphasize that, under the applicable regulations, "it is irrelevant that Plaintiff's personal doctor cleared him for duty, given that the FMCSA specifically requires a nationally registered doctor to provide the certification….The motor carrier has the responsibility for determining whether an

injury or illness has rendered a driver medically unqualified."  ECF 22 at 2-3 (citing 49 C.F.R. §§ 390.5; 391.43; 391.45).

Defendants insist that plaintiff has failed to allege facts supporting a violation of the ADEA, ADA, FLSA, or FEPA, and has also failed to allege facts supporting a claim of wrongful discharge.  ECF 14.  They explain, *id.* at 6 (brackets added):

> Plaintiff alleges he suffered chest pains and arm numbness, universally recognized signs of a cardiac incident, while driving a Dillon's motor coach.  *See* Compl. at ¶ 17.  He then complains that Dillon's: 1) asked that he provide diagnostic information (Compl. at ¶ 22), and 2) required that Plaintiff be cleared by Coach USA's Medical Director (*See* Compl. at ¶ 26).  However, both of those actions are required under the FMCSA regulations.  First, Dillon's could not let Plaintiff go back to work if he had any of the cardiac-related diagnoses set forth in 49 C.F.R. § 391.41(b)(4).  Without providing satisfactory diagnostic information, Plaintiff was ineligible to return to work pursuant to the FMCSA.  Second, because the medical incident impaired Plaintiff's ability to perform his normal duties – i.e. he had [to] stop driving in the middle of a trip and was taken by ambulance to the hospital – Dillon's was required to make sure that Plaintiff was medically certified by a nationally registered medical examiner prior to allowing him to return to driving.  49 C.F.R. § 391.45(c).  Dillon's could not, legally or, for that matter, with any regard for public safety, allow Plaintiff to return to work until it received such certification.  As soon as the medical clearance was received, Dillon's contacted Plaintiff to ask him to return to work, as Plaintiff admits.  Compl. at ¶ 35.

Plaintiff acknowledges that, pursuant to 49 C.F.R. § 391.45(c), a CMV "driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease" is required to be medically examined and be certified, "as physically qualified to operate a commercial motor vehicle."  But, according to plaintiff, "[t]here is nothing in the complaint (or anywhere else in the record before the Court) to support Defendants' bald allegation that Plaintiff suffered an injury or disease."  ECF 18 at 8.  To be sure, plaintiff admits that he "had some sort of medical concern…."  *Id.*  But, according to Mr. Perry, "neither the emergency doctors nor his primary care physician found that he had suffered an injury or had a

disease. Nor was he clinically diagnosed with a myocardial infarction or any other cardiovascular disease, such as those listed in 49 C.F.R. §391.41(b)(4)." *Id.*

Moreover, plaintiff argues, *id.* at 9: "Defendants' claim that they were simply following the medical certification rules loses all credibility given that after the apparent inquiry by DLLR, they suddenly told Plaintiff that their Medical Director had cleared him to return to work….This was despite his having never been examined by Defendants' doctor or certified in the manner they now claim to be mandatory."

In their Reply (ECF 22), defendants contest plaintiff's argument that Mr. Perry did not suffer an injury or disease and therefore was not required to undergo medical examination and recertification. In any event, they argue: "Even assuming, *arguendo,* that Dillon's misinterpreted or misapplied the FMCSA Regulations and that Plaintiff's apparent cardiac event does not constitute an injury or disease, nowhere does Plaintiff suggest how any purported misapplication is indicative of unlawful discrimination or a failure to accommodate under the [ADA] or any other law." ECF 22 at 2, n. 3 (emphases in original).

As noted, pursuant to 49 C.F.R. § 391.45(c), a CMV "driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease" is required to be medically examined and certified, "in accordance with § 391.43…as physically qualified to operate a commercial motor vehicle."

Plaintiff and defendants devote a considerable amount of attention to whether Mr. Perry suffered from an injury or disease that required him to undergo medical examination and certification. The regulations do not define a physical or mental injury or disease. But, the Regulatory Guidance for the Federal Motor Carrier Safety Regulations indicates that a driver returning from an illness is not required to undergo recertification if his current medical

certificate has not expired, "unless the injury or illness has impaired the driver's ability to perform his/her normal duties." 62 FR 16370–01, 1997 WL 153864, at *16411–12 (DOT Apr. 4, 1997). However, an individual is not qualified if he has a "current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." 49 C.F.R. § 391.41(b)(4).

Mr. Perry's complaints of chest pain and numbness while driving on his bus route certainly could have been indicative of a cardiac problem, including a heart attack. *See, e.g., Plemmons v. Roberts,* 439 F.3d 818, 823-24 (8th Cir. 2006) (recognizing that arm and chest pain, sweating, and nausea constitute "classic heart attack symptoms"); *Estate of Carter v. City of Detroit,* 408 F.3d 305, 307-08 (6th Cir. 2005) (recognizing that chest pains and shortness of breath are "some of the classic symptoms of a heart attack."); *Reidhead v. Arizona*, No. CV-12-00089-PHX-JAT, 2014 WL 2861046, at *1 (D. Ariz. June 24, 2014) (noting that chest pain, left arm pain, and numbness and tingling are "classic symptoms of a heart attack that are widely known even among those with no formal medical training"). Given his symptoms, defendants had a duty to ascertain *whether* Mr. Perry suffered from an injury that "impaired" his "ability to perform his/her normal duties." 62 FR 16370–01, at *16411–12. According to the factual allegations contained in the Complaint, this appears to have been exactly what defendants did.

After Mr. Perry's medical incident, the defendants tried to ascertain whether he was fit to drive by reviewing his hospital records.[9] To be sure, plaintiff promptly provided his employers

---

[9] As noted by defendants, ECF 22 at 3, n. 4, the danger presented by a CMV driver who is not medically fit to drive can be deadly, as demonstrated by the fatal collision between a school bus and a commuter bus on November 1, 2016, in Baltimore. *Driver in deadly Baltimore school bus crash didn't have authorization to drive,* Associated Press (November 4, 2016), http://www.foxnews.com/us/2016/11/04/driver-indeadly-baltimore-school-bus-crash-didnt-have-

with a doctor's note authorizing him to return to work after the incident. But, defendants were under no obligation to rely on the say-so of Mr. Perry's physician. *See* 49 C.F.R. § 391.43(a); 49 C.F.R. § 390.5. In fact, allowing employers of CMV drivers to rely on the reports of private physicians would likely undermine the purpose of the medical certification requirements. After about a month, during which Coach's Medical Director received and reviewed Mr. Perry's medical records, the Medical Director cleared Mr. Perry to return to work, *i.e.*, she determined that Mr. Perry did not suffer from a medical injury that required him to undergo examination and recertification.

**B.**

Plaintiff alleges: "But for Plaintiff's age, Defendants would not have fabricated medical requirements for him, harassed him and, ultimately, forced him out of his job." ECF 1, ¶ 40. Further, he states: "Upon information and belief, Plaintiff is not the only older bus driver whom Defendants have tried to eliminate from their employ solely because of their age." *Id.* ¶ 39.

As to the ADEA claim (Count I) and as to the FEPA claim (Count VI), the complaint is utterly devoid of any facts which would suggest that Mr. Perry was treated differently based on his age.

The ADEA broadly prohibits arbitrary discrimination in the workplace based on age." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120 (1985) (citing *Lorillard v. Pons*, 434 U.S. 575, 577 (1978)) (internal citation omitted); *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 357 (1995). Advancing a claim of discrimination under the ADEA mirrors the requirements for pleading under Title VII. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("In assessing claims of age discrimination brought under the

---

authorization-to-drive.html. The driver lacked the requisite medical certification, suffered from a seizure disorder, and crashed. *Id.*

ADEA, the Fourth Circuit, like others,[ ] has applied some variant of the basic evidentiary framework set forth in [Title VII case law]. We have never had occasion to decide whether that application of the Title VII rule to the ADEA context is correct, but since the parties do not contest that point, we shall assume it."); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *accord McKennon*, 513 U.S. at 358.

To plead adequately a claim of employment discrimination under the ADEA, a plaintiff typically must allege: "(1) he is a member of a protected class—that is, 40 years or older; (2) he suffered an adverse employment action; (3) he was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or he was replaced by a substantially younger person." *Bodkin v. Town of Strasburg, Va.*, 386 Fed. Appx. 411, 413–14 (4th Cir. 2010) (per curiam) (citations omitted, alterations in *Bodkin*); *see also Hartman v. Univ. of Maryland at Baltimore*, 595 F. App'x 179, 181 (4th Cir. 2014) (per curiam) (same).

The Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted). "An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citation omitted).

To survive a motion to dismiss, a plaintiff need not plead a *prima facie* case. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). In *McCleary–Evans v. Md. Dep't of Transp.*, 780 F.3d 582 (4th Cir. 2015), the Fourth Circuit said, *id.* at 584–85:

In *Swierkiewicz*, the Supreme Court held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination...to survive [a] motion to dismiss," 534 U.S. at 515, 122 S. Ct. 992, because "[t]he prima facie case...is an evidentiary standard, not a pleading requirement," *id.* at 510, 122 S. Ct. 992, that may require demonstrating more elements than are otherwise required to state a claim for relief, *id.* at 511–12, 122 S. Ct. 992. The Court stated that requiring a plaintiff to plead a prima facie case would amount to a "heightened pleading standard" that would conflict with Federal Rule of Civil Procedure 8(a)(2). *Id.* at 512, 122 S. Ct. 992 .... Accordingly, the Court concluded that "the ordinary rules for assessing the sufficiency of a complaint apply," referring to Federal Rule of Civil Procedure 8(a)(2). *Id.*

At trial, an ADEA claim may be proven using circumstantial evidence "analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)...." *Bodkin*, 386 Fed. Appx. at 413; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 n. 5 (1981) (Title VII); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315 (4th Cir.1993) (ADEA); *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 238–39 (4th Cir.1982) (ADEA). Ultimately, to succeed on an ADEA claim, the plaintiff "must prove...that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 168 (2009).

FEPA, S.G. § 20-602 provides:

It is the policy of the State….

> (1) to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and

> (2) to that end, to prohibit discrimination in employment by any person.

Plaintiff has not set forth any factual allegations that suggest that defendants did not allow Mr. Perry to return to work for a one-month period because of his age. For example, plaintiff has not averred that defendants treated more favorably younger employees who

complained of chest pain and arm numbness, or, for that matter, any other medical symptoms. Rather, the undisputed allegations demonstrate that, while plaintiff was driving on his bus route, he reported symptoms consistent with a cardiac incident, which necessitated his transportation by ambulance to a hospital emergency room, and defendants sought to verify plaintiff's eligibility to return safely to work.

## C.

In his Complaint, Mr. Perry states, ECF 1, ¶ 49: "Assuming Plaintiff did have a medical condition or impairment that could be deemed to constitute a disability affecting major life activities, his doctors had informed him and Defendants that he was clear to work. Nevertheless, Defendants refused to accommodate him, harassed him and eventually forced him out of his job." Plaintiff also contends that his "request and repeated efforts to return to work was protected conduct under the ADA." *Id.*, ¶ 53.

Counts II (ADA violation) and III (ADA retaliation) of the Complaint do not plausibly assert any violations of the ADA.

The ADA, *as amended*, 42 U.S.C. §§ 12101, *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). "The [ADA] prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131–12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182–12189." *A Helping Hand, LLC v. Baltimore County, Md.,* 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).

The statute "makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'" *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (quoting 42 U.S.C. § 12112(a) (2012)). In particular, "[s]uch unlawful discrimination can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee....'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in *Wilson*). In addition, "[t]he Act prohibits covered employers from discharging qualified employees because they are disabled." *Summers*, 740 F.3d at 328. Under the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." *Id.* § 12102(1).

Plaintiff does not cite the relevant titles of the ADA in his Complaint. But, his claims for failure to accommodate and unlawful termination would arise under Title I of the ADA. And, his retaliation claim arises under Title V.

Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is defined as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

Title V includes provisions against retaliation. *See* 42 U.S.C. 12203(a). The ADA states: "No person shall discriminate against any individual because such individual has opposed any

act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff is not required to establish a "prima facie case" or to mechanically recite the elements of these claims. *See Swierkiewicz,* 534 U.S. at 510 ("The prima facie case ... [familiar in employment discrimination claims] is an evidentiary standard, not a pleading requirement."). Rather, "the ordinary rules for assessing the sufficiency of a complaint apply." *Id.* at 511. Thus, as with any challenge to a pleading under Fed. R. Civ. P. 12(b)(6), plaintiff need only put forth sufficient facts to "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Nevertheless, the elements of a prima facie case are a helpful guide in assessing the adequacy of the allegations.

To establish a prima facie case for failure to accommodate, an employee must show: (1) he was an individual with a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001); *see also Stephenson v. Pfizer*, 641 Fed. Appx. 214, 219 (4th Cir. 2016) (per curiam); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

To establish a prima facie case of wrongful discharge, a plaintiff must show that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001); *see also*

*Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. University of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995).

In the Fourth Circuit, to establish a prima facie case of retaliation, a plaintiff "must show (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001). *See also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015) (same).

The factual allegations in the Complaint fail to allege a failure to accommodate or wrongful discharge under the ADA. Rather, after a one-month period during which Mr. Perry's employers sought to ensure that he was physically fit to drive, he was informed that he could return to work.

Nor does the Complaint state a claim for ADA retaliation. The ADA does not grant a CMV driver an automatic right to return to work immediately after suffering symptoms suggestive of a heart attack or a cardiac event, merely because a doctor has said so. As noted, only certain health care providers may render such opinions. 49 C.F.L. § 390.5.

Assuming, *arguendo*, that Mr. Perry engaged in protected conduct, Mr. Perry has not alleged facts showing "a causal link between the protected activity and the employment action." *Coleman v. Md. Ct. of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010). Nor has he alleged facts suggesting that the adverse employment action was a response "to the plaintiff's constitutionally [or statutorily] protected activity." *Baltimore Sun Co. v. Ehrlich,* 437 F.3d 410, 416 (2006). Given Mr. Perry's medical incident, his employers had a duty to assure that he could safely operate a CMV.

As noted, plaintiff also alleges that defendants "falsely reported to the State that Plaintiff had been placed on leave of absence for failing a Department of Transportation ('DOT') physical." ECF 1, ¶ 34. According to plaintiff, defendants "knowingly made a false report to a Maryland state agency with the intent of creating a false record to create a pretext for not letting him work and preventing him from obtaining unemployment benefits." *Id.*, ¶ 55. However, even assuming that this false report was intentional, it remains entirely unclear how this allegation is indicative of age-based discrimination, a failure to accommodate, or wrongful discharge under the ADA. And, as to the ADA retaliation claim, even if the false report to DLLR qualifies as an adverse action, it is not clear what protected activity under the ADA Mr. Perry believes he took. If the allegedly false report gives rise to a cause of action, it is not one that has been raised by plaintiff in his Complaint.

As to Count V, tort liability for wrongful or abusive discharge under Maryland law has been recognized "as a judicially-created exception to the employment at-will doctrine." *Newell v. Runnels,* 407 Md. 578, 646, 967 A.2d 729, 769 (2009) (citing *Adler v. Am. Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981)). The doctrine is narrow, however. In order to assert a viable claim of abusive discharge, an employee must demonstrate that "a clear mandate of public policy...was contravened by the discharge." *Porterfield v. Mascari II, Inc.,* 374 Md. 402, 423, 823 A.2d 590, 602 (2003). And, the particular public policy must be "reasonably discernible from prescribed constitutional or statutory mandates." *Wholey v. Sears Roebuck,* 370 Md. 38, 54, 803 A.2d 482, 491 (2002). On the other hand, because the purpose of the tort is to "provide a remedy for *otherwise unremedied* violations of public policy," *Porterfield,* 374 Md. at 423, 823 A.2d at 602 (emphasis added), the tort is not viable if the statutes that establish the public policy at issue "already provide an adequate and appropriate civil remedy for the wrongful discharge." *Id.* In

sum, the tort of abusive discharge is limited "to cases where an employee's termination contravened a clear mandate of public policy and not to allow the cause of action would leave the employee without a remedy." *Newell,* 407 Md. at 647, 967 A.2d at 769; *see Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996).

Mr. Perry maintains that defendants violated several public policies when they terminated him from his position. He asserts, ECF 18 at 12-13:

> Defendants refused to accept him back to work, first attempting to obtain additional confidential medical information about him from the hospital in violation of HIPPA privacy rules, and then trying to force him to undergo a medical procedure, at his own cost, that his physician would not authorize….In addition, Defendants improperly interfered with Plaintiff's claim for unemployment benefits by falsely reporting to the state agency that he had failed a Department of Transportation physical. This was done with the intent to create a false record in support of a pretext for not permitting him to work while the same time preventing him from obtaining unemployment benefits.

This Count fails to state a claim for the same reasons that the age discrimination and ADA claims fail. In addition, I agree with defendants that plaintiff has failed sufficiently to plead that he was discharged at all. ECF 14 at 7. Rather, as plaintiff admits, after a one-month period, defendants informed Mr. Perry that he was medically cleared to return to work.

Plaintiff counters that at a minimum he was "constructively discharged." ECF 18 at 12. "To establish constructive discharge, a plaintiff must be able to show that his former employer 'deliberately made an employee's working conditions intolerable, and thereby forced him to quit.'" *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir. 2004) (citation and bracket alterations omitted), *cert. denied,* 543 U.S. 959 (2004). "Constructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Crockett v. SRA Int'l,* 943 F. Supp. 2d 565, 577 (D. Md. 2013) (internal citations and quotations omitted). I agree with defendants that "Dillon's reasonable requests

pursuant to the Company's FMCSA obligations cannot possibly constitute constructive discharge." ECF 22 at 4, n. 8.

In addition, in order to state a claim for wrongful discharge, there must be a violation of a clear mandate of public policy for which there is no other remedy. Mr. Perry has not pointed to a violation of public policy committed by his employers, *for which there is no other remedy*. Rather, Mr. Perry's claim for wrongful discharge is duplicative of his claims under the AEDA, ADA, and FEPA, each of which has its own enforcement provision. *See Porterfield,* 374 Md. at 423, 823 A.2d at 602.

**D.**

Plaintiff's FLSA claim (Count IV) is also subject to dismissal for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)) (alterations in *Barrentine*). In particular, the statute "establishe[s] a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek...." *Perez v. Mortgage Bankers Ass'n*, __U.S. __, 135 S. Ct. 1199, 1204 (2015) (quotations omitted) (alterations in *Perez*); *see Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. __, 135 S. Ct. 513, 516 (2014).

The FLSA established the "general rule that employers must compensate each employee 'at a rate not less than one and one-half times the regular rate' for all overtime hours that an employee works." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008) (quoting 29

U.S.C. § 207(a)(1)). Thus, the FLSA is now "best understood as the 'minimum wage/maximum hour law.'" *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (citation omitted); *see also Matherly v. Andrews*, __F.3d__,2017 WL 2467088, at *9 (4th Cir. June 8, 2017) ("The FLSA provides that generally an 'employer' shall pay an 'employee' no less than the federal minimum wage…") (citation omitted); *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1266–67 (4th Cir. 1996) ("The two central themes of the FLSA are its minimum wage and overtime requirements.... The FLSA is clearly structured to provide workers with specific minimum protections against excessive work hours and substandard wages.") (Internal quotations omitted).

According to Mr. Perry, his FLSA claim is "straightforward[.]" ECF 18 at 9. He explains, *id.* at 9-10:

> [Mr. Perry] was ready and able to work, but Defendants falsified the need for additional medical documentation in order to prevent from resuming his driving duties; they required Plaintiff to spend time and effort seeing doctors and securing the documentation; and they required him to communicate with Defendants' representatives about the hoops he supposedly needed to jump through in order to to [sic] return to work, when it was really a pretext for forcing him from his position. He was not paid for any of his time spent performing these actions. Further, because there was no lawful basis for Defendants to treat Plaintiff as if he were on unpaid leave (the alleged "leave of absence" for not having his DOL physical was a fabrication), he should have been paid for his usual workweeks over the 4-week period before he was constructively discharged.

Mr. Perry concludes, *id.* at 11: "Plaintiff's [FLSA] claim is that the employer refused to pay him for a month, while fabricating a medical or regulatory reason for this failure."

Defendants counter, ECF 22 at 4:

> Plaintiff has failed to allege that Dillon's had the legal duty to pay him any wages when he was not actually working. Nor has he alleged that Dillon's failed to pay earned wages when they became due. To the contrary, Plaintiff admits that he did not operate a motor coach for Dillon's during that time period. Therefore, he could not possibly have earned any wages that would be considered due and owing

under the FLSA….[T]he FLSA does not require payment for time that was not actually worked.

Mr. Perry has not cited any legal authority for the proposition that under the FLSA he should have been paid while he was not working. It is also implausible to suggest that Mr. Perry was working for his employers while he was seeing doctors. Rather, Mr. Perry's primary complaint, which underlies each count of his suit, is that he was not allowed to return to work more quickly. The FLSA claim fails as a matter of law because there is no provision in the FLSA that pertains to the return to work after a medical incident. Nor does the FLSA require payment for sick leave. And, Mr. Perry has not alleged that he was entitled to sick leave pursuant to an employment contract or a policy of his employers.

**E.**

Plaintiff's claim for intentional infliction of emotional distress (Count VIII) is subject to dismissal for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

A claim for intentional infliction of emotional distress ("IIED") is disfavored in Maryland and difficult to establish and, as such, is "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011). In order to prevail on a claim for IIED in Maryland, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there is a causal connection between the defendant's wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977); *accord, e.g., Manikhi v. Mass Transit Admin.*, 360 Md. 333, 758 A.2d 95, 112, 113 (2000); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010).

The "extreme and outrageous" standard is quite high. *See generally Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 319 (1995) (stating that the tort of

intentional infliction of emotional distress is "rigorous, and difficult to satisfy"), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841, 850 (D. Md. 2015) (quoting *Harris*, 281 Md. at 567, 380 A.2d at 614). Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59–60, 502 A.2d 1057, 1064, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)), *aff'd*, 166 F.3d 1208 (4th Cir. 1998).

Plaintiff asserts that he suffered emotional distress because defendants "unlawfully" denied his "request to return to work while requiring him to pay for unwarranted medical procedures would create financial stress and harm." ECF 1, ¶ 73. Fatal to this claim, plaintiff has failed to allege any facts that support the conclusory statement that he "has suffered, and will continue to suffer, severe and extreme emotional distress." *Id.*, ¶ 77.

As defendants point out in their Motion to Dismiss, ECF 14 at 12, "Plaintiff was able to find another job in under a month while Dillon's waited for his medical clearance, directly contradicting any claim that he suffered emotional distress severe enough to 'shatter the frame' of his 'emotional fabric.'" (Quoting *Farasat*, 32 F. Supp. 2d at 248.) Plaintiff appears to admit as much. *See* ECF 18 at 14 (acknowledging that "Plaintiff was able to pick himself up by the bootstraps and obtain other employment…."). Accordingly, this claim is subject to dismissal.

### IV.   Conclusion

For the reasons stated above, I shall GRANT defendants' Motion to Dismiss (ECF 14), without prejudice.

Plaintiff shall be afforded 21 days from the entry of this Order to file an amended complaint.  If the suit is not amended by that date, the Clerk shall be directed to CLOSE the case.

An Order follows.


Date: June  9, 2017                                     _____/s/_____
                                                        Ellen Lipton Hollander
                                                        United States District Judge